UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.  25cr10277 |
| v. | Violations: |
| KRISHNA GIDWANI, | Count One: Conspiracy to Commit Health Care Fraud<br>(18 U.S.C. § 1349) |
| Defendant | Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

INFORMATION

At all times relevant to this Information:

General Allegations

*The Defendant*

1.     Defendant KRISHNA GIDWANI, a resident of Canton, Massachusetts, was the owner, manager, and operator of Blue Hill Medical Supply ("Blue Hill").

*Related Entities*

2.     Blue Hill was a Massachusetts limited liability company purportedly based in Walpole, Massachusetts.

3.     Blue Hill was purportedly a supplier of durable medical equipment ("DME"), such as orthotic braces.

4.     Raju Sharma ("Sharma"), a resident of Sharon, Massachusetts, owned and operated several DME companies.  Beginning in or about December 2020 and continuing through at least December 2022, Sharma owned and operated Pharmagears, LLC ("Pharmagears").  Beginning in

1

or about December 2021 and continuing through at least February 2023, Sharma also owned and operated RR Medco, LLC ("RR Medco").

5.     Sharma also recruited other individuals, including his family members and acquaintances, to open their own DME companies, including Blue Hill (the "Related Companies") in the model of Pharmagears and RR Medco and instructed them how to do so.  Sharma then served as a "consultant" to the Related Companies.  In exchange for helping establish the Related Companies and teaching co-conspirators how to purchase leads from marketers and bill Medicare for medically unnecessary DME, Sharma collected a fee and/or commission from the Related Companies.

*The Medicare Program*

6.     The Medicare Program ("Medicare") was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled.  The benefits available under Medicare were governed by federal statutes and regulations.

7.     Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

8.     The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

9.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."  Each beneficiary was given a unique Medicare identification number.

10.     Providers such as doctors and nurses obtain Medicare National Provider Identifiers ("NPIs") which were unique to each provider.

11.     Medicare included coverage under component parts. Medicare Part B covered, among other things, physician services, outpatient care, and DME.

12.     Health care providers that provided services to Medicare beneficiaries, including DME suppliers and pharmacies, were able to apply for and obtain a "provider number."  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

*Durable Medical Equipment*

13.     DME was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

14.     Medicare reimbursed DME providers for medically necessary items and services rendered to beneficiaries.  In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

15.     Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition and was provided to a beneficiary.  When seeking reimbursement from Medicare, providers submitted, among other things, the appropriate "procedure code," as set

forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

16.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

<center>Overview of the Conspiracy</center>

17.     From in or about December 2020 through in or about February 2025, Sharma, GIDWANI, and others known and unknown to the United States conspired to commit health care fraud by: using telemarketers or call centers to obtain medical information from or about Medicare beneficiaries; using that information to prepare medical documentation, including orders, for DME for Medicare beneficiaries that made it appear that medical practitioners were legitimately prescribing the DME to these beneficiaries; submitting claims to Medicare for orders for DME; and paying the telemarketers per order approved by Medicare.  These orders were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and otherwise not covered by Medicare.  Medicare would have denied these claims had it known the process by which these claims were generated.

18.     Between approximately September 2023 and April 2024, Blue Hill submitted a total of approximately $4.7 million in false and fraudulent claims to Medicare, for which Medicare paid approximately $3 million.

19.     Blue Hill submitted claims to Medicare for beneficiaries living in Massachusetts.

<center>Object and Purpose of the Conspiracy</center>

20.     The object of the conspiracy was to obtain payment from Medicare for claims for DME that were medically unnecessary, based on false documentation, tainted by kickbacks and

<center>4</center>

bribes, and that Medicare otherwise would not have reimbursed. The principal purpose of the conspiracy was for GIDWANI, Sharma, and others known and unknown to the United States to unlawfully enrich themselves by, among other things, soliciting, offering, paying, and receiving kickbacks and bribes designed and intended to generate orders and medical records for DME (collectively, "orders") without regard to medical necessity, accuracy of the orders, and whether the DME was eligible for reimbursement, for which DME companies such as Blue Hill submitted claims for payment by Medicare and diverted the fraud proceeds for their personal use and benefit.

<u>Manner and Means of the Conspiracy</u>

21.     Among the manner and means by which GIDWANI, Sharma, and others known and unknown to the United States carried out the conspiracy were the following:

22.     Offering, agreeing to pay, and paying kickbacks and bribes to marketers to obtain orders for DME containing Medicare beneficiary information that were not medically necessary and not eligible for Medicare reimbursement.

23.     Hiding these illegal kickbacks by creating and executing sham contracts with marketers which appeared to require payments to the marketers on a flat fee or hourly rate and further concealing the illegal kickbacks through sham invoices that showed payments to marketers were calculated based on that flat fee or hourly rate.

24.     Submitting orders for DME which were purportedly signed by doctors or other providers who, in fact, had no treating relationship with the beneficiary and, in some cases, had no idea their NPI was being used to order DME at all.

25.     Submitting false and fraudulent claims to Medicare for DME orders that were (a) induced through kickbacks, bribes, and other illicit incentives; (b) designed for maximum

reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and/or (e) not properly prescribed by a medical practitioner.

26.     Concealing the submission of false and fraudulent claims to Medicare.

27.     Diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

28.     Opening new DME companies with new names and new principals when existing DME companies were placed on payment suspension by CMS.

<u>Acts in Furtherance of the Conspiracy</u>

29.     From in or about December 2020 through in or about February 2025, GIDWANI, Sharma, and co-conspirators known and unknown to the United States committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

a.     On or about September 2, 2021, Sharma sent an email to Marketer 1 regarding their contract, stating, "I think you can't put prices of each brace then it shows I am buying leads for a cost which is not legal instead you should put marketing service charges of $4000 per week and we work out the leads cost payout on a separate sheet.  All marketing agreements I have in place are on the same lines bec [sic] Medicare wants to ensure DME pays as per the marketing services charges mentioned in the agreement and we can't mention per brace price."  The next day, Sharma negotiated the price he would pay Marketer 1 for different orthotic braces based on the payout he would receive from Medicare.

b.     On or about September 19, 2021, Sharma sent an email to Marketer 2 with a contract stating that Pharmagears would pay the marketing company a fixed fee

which did not take into account the volume or value of any referrals or business otherwise generated between the parties. Several minutes later, Sharma sent another email to Marketer 2 with the subject "Rates." The content of the email contained specific prices Pharmagears would pay Marketer 2 for each type of DME ordered and specified that Pharmagears payments would be adjusted if any DME was returned by the patient or if Medicare did not pay for the DME.

c.  In or around mid-to-late 2021, Sharma recruited Business Partner 1 and Business Partner 2 to open a new DME company in the model of Pharmagears and RR Medco ("Related Company 1").

d.  On March 17, 2022, Sharma sent an email to the business email address for Related Company 1 with the subject "marketing agreement and spreadsheet you need to send to all mktg companies." Sharma attached a sham Pharmagears contract with a marketing company and directed Business Partner 1 and Business Partner 2 to "add [Related Company 1] wherever Pharmagears LLC is mentioned and add your co address and signatures" to the contract.

e.  In early 2023, Sharma recruited GIDWANI to open a new DME company in the model of Pharmagears and RR Medco—that new company was Blue Hill. GIDWANI enrolled Blue Hill in Medicare in or around May 2023 and began billing for orthotics in or about September 2023.

f.  On or about June 30, 2023, GIDWANI received an email from an employee who worked for Blue Hill, as well as other Related Companies, attaching an audio recording of the conversation between a marketer and beneficiary underlying a

DME order the marketer had generated for one of the Related Companies.  In the recording, the marketer represents that he is calling from a large brand-name commercial pharmacy.  GIDWANI understood that the marketer was not actually from that pharmacy and was misrepresenting himself.  Nevertheless, GIDWANI advised the employee that he had listened to the recorded call, that in the recording the beneficiary had authorized shipment of the orthotic brace, and that the employee should therefore bill Medicare for the brace on behalf of the Related Company.

g.  In or about October 2023, Blue Hill billed Medicare approximately $2,951 for a back brace and two knee braces with suspension sleeves for Beneficiary 7.  Beneficiary 7 did not need and did not want the braces Blue Hill delivered.  Prior to receiving the braces from Blue Hill, Beneficiary 7 received a cold call from an individual who was very pushy, even when Beneficiary 7 stated that they did not want the braces.  The doctor whose signature appeared on the orders did not treat Beneficiary 7 and did not prescribe DME for Beneficiary 7.

h.  In or about December 2023, Blue Hill billed Medicare approximately $2,951 for a back brace and two knee braces with suspension sleeves for Beneficiary 8.  Beneficiary 8's spouse filed a complaint with the Office of Inspector General, HHS because Beneficiary 8 did not order the braces, nor did Beneficiary 8 need the braces.  Doctor 2, whose signature appeared on the orders, did not treat Beneficiary 8 and did not order DME for Beneficiary 8.  Doctor 2 was listed as the prescribing provider on claims for approximately 69 other beneficiaries submitted by Blue Hill, as well as claims for another approximately 37 beneficiaries submitted by

Pharmagears, RR Medco, and other Related Companies. Doctor 2 treated only 1 of the 106 beneficiaries for whom claims had been submitted with Doctor 2's purported signature, and even for that single beneficiary, the doctor did not prescribe DME.

## COUNT ONE
Conspiracy to Commit Heath Care Fraud
(18 U.S.C. § 1349)

The United States Attorney charges:

30.    The United States re-alleges and incorporates by reference paragraphs 1-29 of this Information.

31.    From in or about December 2020 through in or about February 2025, in the District of Massachusetts, the Northern District of Illinois, and elsewhere, the defendant,

KRISHNA GIDWANI,

knowingly and willfully conspired with Raju Sharma and others known and unknown to the United States to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money or property owned by, and under the custody and control of, health care benefit programs, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

32.     Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant,

KRISHNA GIDWANI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following assets:

    a.  $2,005,503.91 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

33.     If any of the property described in Paragraph 32, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant --

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 32 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

<div style="margin-left:auto;">

LEAH B. FOLEY
United States Attorney
District of Massachusetts


*/s/ Sarah B. Hoefle*___
LAUREN A. GRABER
SARAH B. HOEFLE
Assistant United States Attorneys
District of Massachusetts

</div>

June 27, 2025